662 So.2d 1312 (1995)
Maria Luisa ALVAREZ, f/k/a Maria Luisa Castillo, Appellant,
v.
Fernando GARCIA and Alina Garcia, his wife, Appellees.
No. 95-165.
District Court of Appeal of Florida, Third District.
October 25, 1995.
Rehearing Denied December 6, 1995.
Gilbride, Heller & Brown and Dyanne E. Feinberg, Miami, for appellant.
Edilberto O. Marban, Coral Gables, for appellees.
Before HUBBART, JORGENSON, and GERSTEN, JJ.
*1313 JORGENSON, Judge.
Maria Luisa Alvarez, homeowner, appeals from a nonfinal order establishing liability, and ordering reformation and specific performance of a contract for the sale of her property.[1] For the following reasons, we reverse.
In August, 1992, Fernando and Alina Garcia began negotiating with Alvarez for the purchase of Alvarez' home. The parties initially could not agree on a purchase price, but on September 22, 1992, almost one month after Hurricane Andrew hit South Florida, the parties signed a sales contract by which the Garcias agreed to pay Alvarez $130,000.00 for the property. The buyers were aware that the roof of the house had been damaged during the storm, and obtained a repair estimate. The seller also obtained estimates, which far exceeded the buyers' estimates. The seller did not have repairs made to the roof, but obtained a substantial insurance settlement for storm damage to the structure.
Before closing on the property, the buyers conducted another inspection and discovered that the house required extensive work. The roof had not been repaired and serious leaks had developed, causing the residence to deteriorate. Necessary repairs were estimated to be $13,000. The seller refused to fix the property or turn over the insurance proceeds to the buyers, and sought to cancel the contract. The buyers then sued for reformation and specific performance of the sales contract. The trial court entered judgment for the buyers and ordered the seller to pay to the buyers all insurance proceeds received for damage to the residence. In so doing, the trial court misinterpreted the plain terms of the contract.
The sales contract provides in Paragraph N, captioned "Risk of Loss," that
If the Improvements are damaged by fire or other casualty before delivery of the deed and can be restored to substantially the same condition as now existing within a period of 60 days thereafter, Seller may restore the Improvements and the closing date and date of delivery of possession hereinafter provided shall be extended accordingly. If Seller fails to do so, Buyer shall have the option of (1) taking the property as is, together with the insurance proceeds, if any, or (2) cancelling the contract and all deposits shall be forthwith returned to Buyer and the parties released of any further liability hereunder (emphasis added).
However, the sales contract also provides, in Paragraph F regarding repairs to the roof, that
Seller shall pay up to two percent (2%) of the purchase price for said repairs which shall be performed by a licensed roofing contractor. However, if the costs for such repairs exceed two percent (2%) of the purchase price, Buyer may elect to pay such excess. If Buyer elects not to pay, Seller may pay the excess or cancel the contract.[2]
An addendum to the contract, executed by both seller and buyers, further provides that
Should the seller not wish to pay any required repair and the Buyers elect not to pay, and a compromise cannot be reached, this contract may be cancelled by either seller or buyers with the full escrow deposit refunded immediately to the Buyers.
This contract addendum, read together with Paragraph F of the sales contract, allows the seller to refuse to pay for repairs to the residence and instead, cancel the contract. The Buyers mistakenly rely upon Paragraph N, the Risk of Loss clause, to support their claim of entitlement to the insurance proceeds. However, Paragraph N refers to the condition of the property "as now existing." When the sales contract was executed on September 22, 1992, the property had already been damaged by Hurricane *1314 Andrew, and the buyers were aware of the damage.
When determining the rights and obligations of the parties, a court looks to the purchase and sale agreement. See, e.g., Munshower v. Martin, 641 So.2d 909 (Fla. 3d DCA 1994). In Munshower, the parties entered into an agreement for the purchase of a home. The agreement contained a risk of loss clause by which the seller assumed the risk of loss or damage until closing. After the purchase and sales agreement was executed, Hurricane Andrew struck, damaging the home. This court held that the risk of loss provision governed, as the storm was a casualty that occurred after the agreement was executed. The court applied the doctrine of equitable conversion, and held that the insurance proceeds became the property of the seller, who then indemnified the buyer for the actual loss caused by the casualty. Munshower, 641 So.2d at 911. Here, however, the buyers never pled the doctrine of equitable conversion. Moreover, the casualty in this case occurred before the sales contract was executed. The seller's rights, therefore, were controlled by Paragraph F and the contract addendum, which gave her the absolute right to elect not to pay for the repairs and to cancel the contract.
The court further erred when it reformed the contract based upon the broker's assurances to the buyers that the seller would apply the insurance proceeds to effect repairs on the roof. There was no evidence that the broker was authorized to bind the seller through any oral agreement that varied the terms of the sales agreement. See Camichos v. Diana Stores Corp., 157 Fla. 349, 25 So.2d 864 (1946) (contract reformation denied where broker or agent of lessor not authorized to bind lessor by any oral agreement made by him).
Finally, there is no evidence in the record of mutual mistake that would support reformation of the agreement. "A court of equity has the power to reform a written instrument where, due to a mutual mistake, the instrument as drawn does not accurately express the true intention or agreement of the parties to the instrument." Providence Square Ass'n v. Biancardi, 507 So.2d 1366, 1369 (Fla. 1987). However, "in reforming a written instrument, an equity court in no way alters the agreement of the parties. Instead, the reformation only corrects the defective written instrument so that it accurately reflects the true terms of the agreement actually reached." Biancardi, 507 So.2d at 1370. In this case, the sales agreement allowed the seller the option of not making the repairs and cancelling the contract. There was no contract provision that required the seller to use the insurance proceeds to repair the house, and no evidence that the parties intended to include such a provision, but mistakenly omitted it.[3]
In sum, we reverse and remand with directions to enter final judgment for the seller.
NOTES
[1] The amount of damages was to be determined in a later proceeding.
[2] The estimate for repairs to the roof  $13,000.00  far exceeded 2% of the purchase price of $130,000.00.
[3] The buyers also failed to establish unilateral mistake; they rely on the broker's testimony that she intended to include in the sales contract a clause dealing with the disposition of insurance proceeds. However, "[a] unilateral mistake made by a third party acting on behalf of one of the parties cannot be the basis for ordering reformation of a deed." Adair v. Hightower, 512 So.2d 982, 984 (Fla. 1st DCA 1987).